Scott v. Guernsey.

ject of which is to aid its members by loans or advances of money, cannot be strictly called benevolent or charitable. The Secretary of State refers to an act passed in 1870, (ch. 169,) and to the act passed in 1871, (ch. 91,) and points out that these two special acts seem to provide, substantially, for similar purposes as those sought to be accomplished under this association. He urges, and with great weight, that these acts give a construction, by the legislature and by the executive, favorable to his position; that is, that the purposes of this association cannot be attained under the general act of 1848.

I have not examined the objections taken by the defendant's counsel to some details of the certificate of association, having decided to deny the motion upon the grounds above mentioned.

Motion for mandamus denied, with $10 costs of motion, to be paid by the relators.

[ALBANY SPECIAL TERM, April 25, 1871. *Learned*, Justice.]

| 60 163
| 137a 124

———•••———

# D. WILMOT SCOTT and others *vs.* WILLIAM G. GUERNSEY and others.(*a*)

In giving construction to a will, the expression, "at the time of *executing* this my last will," *held* to mean the time when its provisions should be carried into effect or executed; such rendering being required, to give sense and effect to the will, and that being the intention of the testator as derived from the whole will, and from the situation of the testator's family.

The clause, "I will that the above described premises be for the use of my daughter Polly Guernsey during her natural life, then to be divided amongst her now surviving children, *or* any of them that may be alive at her decease, *or* the heirs of any that may be dead at the time of executing this my last will," taken technically, gives to one class, *or* to another; and but for the power of the court to change *or* to *and*, and give expression to the testator's evident intention, would be void for uncertainty.

(*a*) Affirmed by the Commission of Appeals, —— 1871.

Scott *v.* Guernsey.

In such a case it is the duty of the court to adopt that construction which will leave the will effectual in law; and, if possible, give effect to every clause.

At the time the will was *signed*, Polly Guernsey had a daughter living—Polly Thompson—who died before her mother, but left issue surviving the mother. *Held* that her issue took, under the will, their mother's share.

On partition in equity, the court will order an accounting, and dispose of all questions arising between the parties in relation to the land, and its use, and afford complete relief.

Where the title of the parties depends upon the construction to be given to a will, and the defendants are in possession, claiming that by the will they are entitled to exclusive possession, and they deny the plaintiff's right, an action for a construction of the will, for a partition and for an accounting, will lie; and this court will not require the plaintiffs to first try the question of title, in an action of ejectment.

One entitled in remainder, as co-tenant, during the life estate, by permission of, and agreement with, the life tenant, erected buildings on the common property, and received rents for the same, before and after the termination of the life estate. *Held* that on partition he could not hold the buildings, or their value, and must account for the rents received after the death of the life tenant.

Nor will equity support such a claim, where the co-tenant has, by the rents received during the life estate, been fully reimbursed for all his expenditures and interest.

One tenant in common in possession of the common property is only liable to pay rent, when he agrees to pay it; and such an agreement only enures to the benefit of the co-tenant with whom it is made. Nor can he set off against such rent the cost of improvements and additions not strictly repairs.

A tenant in common occupying without agreement to pay rent, is not liable, on partition, to account for rent, even though the occupancy be by a firm of which the tenant in common is a partner.

A tenant in common receiving rents is liable to pay interest on the sums so received, without a previous demand.

The rent so received is a lien on the shares of the parties receiving it, in favor of the parties to whom it is due.

If one tenant in common, to whom one or more co-tenants is or are indebted for rents, dies, his administrator is a proper party to an action for partition and an accounting.

In an action for a partition, the property consisted of village lots, and the referee held that it should be sold in separate lots, as it would thereby bring the most money. Some of the shares were small, some incumbered by judgments, and others reduced by liens for excess of rents received. *Held* that the decision that the property should be sold in parcels was not inconsistent with a finding that actual partition could not properly be made, and that a sale was proper.

A tenant for life, and one of the remaindermen, erected buildings on the common property, procured insurance thereon, and gave a premium note. After

the death of the tenant for life, the remainderman was assessed on the note and paid the assessment. *Held* that in accounting for rents received, he was not entitled to an allowance for the premium thus paid.

A report of a referee, directing that a public street be opened through property cannot be sustained; but the court may order a sale of lots, with a reserved lane or right of way, common to the lots sold.

*It seems* that tenancy by the curtesy still exists, as prior to 1848, where the wife dies intestate, or without devising land held by her.

THIS was an action for the partition or sale of certain lands in the village of Norwich, N. Y., consisting of a block of stores, certain other buildings, and other lands suitable for village building lots, in all about twelve acres of land. The title was in question, depending upon the construction to be given to the will of William Spier, deceased. The plaintiffs demanded a construction of the will, a partition or sale of the land, and an accounting for rents received.

The original plaintiffs, four in number, and three of the defendants, were the children and heirs at law of Polly Thompson, deceased. As such, they claimed to own an undivided third of the premises. Two defendants, it was conceded by the plaintiffs, own each one third. These were William G. Guernsey and Lavinia Guernsey. They, however, claimed one half each, to the exclusion of the Thompson heirs.

In 1821, William Spier, then the owner of the premises, made his will, to which he appended a codicil in 1830, and died in 1833. In this will, after making provision for his wife, and some children, he said : "I give my eldest daughter, Polly Guernsey, in addition to what I have already given her, a lot of land;" (describing it, covering the land in question.) He then proceeds: "I will that the above described premises be for the use of my daughter, Polly Guernsey, during her natural life; then to be equally divided amongst her now surviving children, or any of them that may be alive at her decease, or the heirs of any that may be dead at the time of executing this my last will."

Further on, in the will, occur the following clauses: "Should it so happen, in the course of divine providence, that any of my daughters should be dead, and leave no heirs living at the time of executing this my last will, then their shares to be equally divided amongst the living, or the heirs of those not living;" and "I will further, that if it should happen, in the course of providence, that if either of my children should die and leave no heirs of their own body living, at the time of executing this my last will and testament, then I will that their shares shall be divided amongst my surviving heirs as above."

Mr. Spier lived and died in Columbia county, a distance of 150 miles from this land, while his daughter Polly Guernsey lived at Norwich, on the premises. In 1821 Polly Guernsey was 43 years of age and had four children living—Peter, aged 22; Polly, 20; and the defendants, William G. and Lavinia, who were about 12 and 5 years of age. Peter died in 1829, leaving two children, one of whom is still living. This child, on reaching his majority, parted with his interest in the land in dispute to the other parties, to be held by them in the same proportions as they held under the will. In 1829, and before the codicil was made, William Spier learned of the death of Peter, and that he left issue. There is nothing in the codicil in any way affecting the Norwich lands. Polly Guernsey died in 1854. Previously to this, in 1847, her daughter, Polly Thompson, died, leaving a husband her surviving; and seven children, parties to this action.

In 1834, William G. Guernsey erected a building upon the premises, with the consent of his father and his mother, Polly Guernsey, then life tenants, and under an agreement that he should have the rents of the building. He received the rent for the buildings he thus erected, from 1834 until 1864, at which time an accounting was had in this action. He claimed that, in case the Thompson heirs held under the will, he was entitled to the rents of the

Scott *v.* Guernsey.

buildings he erected, less the value of the ground rent, and that he was entitled to the buildings themselves, by having the land on which they stood set apart to him. He also erected an office building on the land, which was burned in 1859, and before he had received rents for the same equal to the cost of building it. Polly Guernsey had also erected some buildings on the land. She and her son William procured the whole buildings, which were occupied as stores, to be insured in a mutual insurance company. They jointly gave a premium note for the insurance. After the death of Polly Guernsey, assessments were made upon this note and paid by William, and he claimed to be allowed these assessments on the accounting. A small portion of the land had been occupied by William G. Guernsey in person; and James G. Thompson, one of the children of Polly Thompson, had occupied a store on the premises; and, while so occupying, had built an addition to the store. Part of the time of his occupancy he had a partner. He promised Lavinia Guernsey to pay rent for the store. He claimed that he should be allowed the cost of the addition to the building put on by him.

The defendants insisted that the plaintiffs could not maintain this action, without first testing the title by an action of ejectment, as they, the defendants, were in possession claiming title.

Pending the action, Mary Scott, one of the plaintiffs, died intestate, leaving a husband, D. Wilmot Scott, and one son, surviving her. An order was made continuing the action in favor of the administrator, the husband and the son. This order was opposed. Mary Scott was married in 1848. Certain judgment creditors of two of the parties were also made parties to the action.

The action was commenced and tried before Judge Mason, in 1860. He held that the Thompson heirs were entitled to one third of the land; that the action was

properly brought; and appointed a referee to take an accounting.

The referee took an accounting; found the value of the buildings erected by William G. Guernsey, and the value of the ground rent. He held him liable to account for all the rents received for these buildings from and after his mother's death. He reported against his claim to own or be allowed for the buildings themselves. He charged him the rent received for the office building after his mother's death, and refused to credit him the cost of the building, or any part of it. He found that William had received as rent for the buildings he erected a much larger sum, before his mother died, than the buildings cost.

He also held that the liability for the rents received was a lien upon the shares of the persons receiving them, in favor of the co-tenants to whom they were due.

He also held James G. Thompson liable to pay rent to his co-tenants, both while occupying alone, and while he occupied with a partner; but allowed him the cost of the addition he erected as an improvement.

The referee also found that the property was so situated that it should be sold in parcels or building lots; while, at the same time, the shares and liens were such that it could not be properly partitioned. In one place he directed the opening of a street through the lands; in another, the opening of a lane for the use of certain lots laid out of the premises. One of the parties had employed an agent to collect her rents, for which she paid five per cent. This the referee did not allow to her.

The court, on motion to confirm the report, and for final judgment, gave the following opinion:

MASON, J. I do not see any reason for interfering with this report of the referee, so far as he has reported against a partition of these premises, and in favor of a sale. I do not think that a partition can be made without

Scott *v.* Guernsey.

prejudice to the rights of the owners, and the report is in this respect confirmed and a sale of the premises ordered. And, I am of opinion that it will be advantageous to the interests of the parties to sell the same in parcels, in the manner recommended in the report of the referee; and the report is in this respect confirmed, and the sale ordered accordingly; except as to the strip which he recommends to be thrown open and left as a street for the use of the public. I refer to the strip on the fair ground lot, which the referee recommends in his report to be thrown open as a street. This branch of the report cannot be approved, and that strip may be sold as a separate lot, and the judgment will so direct.

The referee was right in refusing to allow William G. Guernsey for the buildings put up by him on the premises. These buildings were put up, not by a life tenant, but by William G. Guernsey, by an agreement with the life tenant, that if he would put them up, he might have the rents. This contract was faithfully carried out, and William G. Guernsey actually received, in the lifetime of the life tenant, in rents, more than twice what the buildings cost him. It is apparent that they were not put up with any intention or expectation of charging his co-tenants, the remaindermen, with the cost when they should come into the possession of their shares. They were put on at a time when William G. Guernsey had not the right of possession of these premises, any more than a stranger, and when he acquired all his rights to enter and put them up, through a special agreement with the life tenant, who was in actual possession. That agreement, in short, was that he, William, might take possession and put up these stores and have the rent to reimburse him. He ran the risk of the venture. If the tenant died before he got rents sufficient to pay him for his expenses, it was his loss. William G. Guernsey entered into this agreement with the life tenant knowing that he could not acquire any right

under it to possess and take the rents after the death of the life tenant. The report, so far as it disallows this claim of William G. Guernsey, and so far as it charges him with the rent of these stores, after the death of Polly Guernsey, is confirmed.

The report, so far as it charges rents, and the amount of rents, against Lavinia Guernsey is approved, except there must be deducted therefrom her expenses in collecting them. What she had to pay Mr. Powers, for collecting these rents cannot be said to be rents received by her, and the report must be modified by deducting from the rents charged against her, what she had to pay to her attorney, Mr. Powers, for collecting these rents.

I cannot see upon what principle James G. Thompson can be charged with the rent of the store occupied by him, only so far as he occupied under an agreement to pay rent; and I do not see any agreement proved to pay such rent, except to Lavinia Guernsey. He must account to her for one third of the rent while he so occupied, but is not liable, it seems to me, to any one else. These tenants, in common, hold in severalty their interests; and an agreement with one tenant in common, to account to her, does not render him liable to the others who permit him to occupy without any agreement or understanding as to rent, and the report must be modified in this respect; and this it seems to me must be the rule, the whole time of his occupancy, for it can make no difference that he had a partner in business with him in trade, as he has not received any rents, but has merely occupied, which cannot render him liable, in the absence of all agreement. (*Woolever* v. *Knapp,* 18 *Barb.* 265.) I know of no principle, however, upon which he can be allowed pay for the $279.68, which he put upon this store while he occupied it. Occupying as tenant in common, without any agreement with tenants, he can not charge it to them; and the rule is well settled that the tenant cannot make such im-

Scott v. Guernsey.

provements and charge them to his landlord when he occupies under a lease.

This must be disallowed to him. D. Wilmot Scott has a life estate here as tenant by the curtesy, and so has Franklin Beebe and Caleb A. Thompson, if they have had a child born alive after marriage, and the report must be modified in this respect. In all other respects, the report is confirmed, and judgment directed in accordance therewith, and the costs of the respective parties are to be taxed and paid out of the proceeds.

From the judgment entered in pursuance of this opinion, the defendants William G. Guernsey and Lavinia Guernsey appealed; the Thompson heirs and William G. Guernsey and James G. Thompson also appealed from that part of the decision relating to the accounting.

*B. F. Rexford,* for William G. Guernsey and James G. Thompson.

*D. M. Powers,* for Lavinia Guernsey.

*Isaac S. Newton,* for the respondents.

I. The intention of the testator is the first great object of inquiry. (4 *Kent's Com.* 534, *note c, and* 535, *note. b. Bacon's Abr. title Wills,. g, and cases cited.* 2 *Seld.* 420. 3 *Comst.* 538.) The testator intended that Polly Guernsey should have a life estate in the Norwich land, and that her descendants should take the fee subject to her life estate. Strictly construed, the will would be void for uncertainty. But changing *or* to *and,* and giving the popular sense to the word *executing,* it becomes sensible and just; every part has a meaning and is preserved. (19 *N. Y.* 348. 2 *Paige,* 130. 3 *Bradf.* 64. *Bacon's Ab., Wills, g, and cases cited from* 4 *to* 7 *of Vesey.* 40 *Barb.* 89.) Possible as well as actual events are to be regarded. (11 *Vesey,* 457.) With *or* changed to *and,* the will would provide for the children

of Polly Guernsey then living, for the heirs of any that were dead, if it had happened that any were dead, and for any that might thereafter be born. (6 *John.* 54. 5 *Paige,* 512. 19 *N. Y.* 364. 1 *John. Ch.* 228. 3 *Duer,* 354. 1 *Jar. on Wills,* 443, *and cases in note* 1; *also p.* 446.) A reasonable intent should be supposed, instead of an unreasonable one. 1 *Redf. on Wills,* 439.) The testator in using the word *executing,* meant the time when its provisions are *executed,* that is, carried into effect. (3 *Barn. & Cres.* 825. 3 *Barb. Ch.* 475. 1 *Redf. on Wills,* 464.) Three times, in the will, he uses the expression, " executing this my last will;" and every time it is connected with words pointing to the future. Therefore we must construe it, if possible, as meaning a time in the future. (1 *Redf.* 428, *and* 449–451. 11 *Mass.* 531.) The heir at law is not to be disinherited, unless such be the manifest intention of the testator, (5 *Pick.* 536; 1 *Redf.* 435;) and words favorable to him should have a liberal construction. (6 *Mass.* 174. 33 *N. Y.* 550. 1 *Bradf.* 450. 3 *Denio,* 461.) A remainder will not be held contingent when it can be taken to be vested. The law leans against conditions. (35 *N. Y.* 168. 4 *Sandf. Ch.* 36. 2 *Comst.* 436. *Butler's Fearne,* 387, *n.* 5 *Sandf.* 522, *and cases cited.*)

II. The court, in this action, can decide the question of title. (4 *Keyes,* 448. 28 *N. Y.* 508. 15 *id.* 617. 13 *How.* 476. 9 *Cowen,* 430. 5 *Denio,* 285.) The possession of one tenant in common is possession of all, and partition lies. (*Hoff. R.* 21. 9 *Mass.* 508. 14 *id.* 434. 89 *id.* 192. 13 *Metc.* 462, 464. 6 *Cush.* 475. 9 *Pick.* 66.)

III. A tenant in common cannot make improvements and recover for them, (6 *Paige,* 405; 6 *Cowen,* 475; 2 *Caines,* 303; 10 *Barb.* 590; *Id.* 626,) unless made in good faith, by one supposing he had title; or where to disallow it would work a grievous wrong. (3 *Edw. Ch.* 323. 3 *Sandf. Ch.* 64. 6 *Paige,* 404. 3 *id.* 199. 2 *A. K. Marsh,* 581. 1 *Barb.* 500, 510.)

Scott *v.* Guernsey.

IV. William G. Guernsey is not entitled to an allowance for the insurance premiums paid by him. (36 *Barb.* 368.)

V. The judgment for a sale is proper. (2 *Barb.* 599.) That, too, was a question of fact for the court below.

The administrator of Mary Scott is a proper party. She had a lien for the rents due her. The action at law given by 1 *R. S.* 750, § 9, is cumulative, and does not prevent the lien. (4 *Paige,* 343. 4 *Keyes,* 448.)

The court having acquired jurisdiction, will order and take an accounting, and settle every equity. (4 *Barb.* 228. 28 *N. Y.* 508. 4 *Paige,* 9, 342, 343. 1 *Paige,* 125. 2 *id.* 217. 2 *Barb. Ch.* 165. 12 *Abb.* 311. *Hoff.* 21. 1 *Barb.* 500. 11 *How.* 489. 2 *Barb. Ch.* 399.)

*By the Court,* PARKER, P. J. This is an action for partition. The parties all claim under the will of William Spier, bearing date May 24, 1821, to which a codicil was added October 4, 1830. The testator died in 1833. The clause of the will on which the title of these parties, to the lands in question, depends, is as follows : " I give my eldest daughter, Polly Guernsey, in addition to what I have already given her, a lot of land containing thirty-five acres, together with all the privileges and appurtenances belonging, or in anywise appertaining, (except where, on any part of the premises, I have heretofore given a release, or by any means discharged my right.) The lands lie in the town of Norwich, county of Chenango, State of New York, whereon Peter B. Guernsey now resides. I will that the above described premises be for the use of my daughter Polly Guernsey during her natural life, then to be equally divided amongst her now surviving children, or any of them that may be alive at her decease, or the heirs of any that may be dead at the time of executing this my last will."

In May, 1821, Polly Guernsey had four children, Peter

B. Jr., Polly, and the defendants William G. Guernsey and Lavinia Guernsey. Peter B. Guernsey, Jr., died April 15, 1829, leaving two children surviving him; one of whom died in infancy, and the other, William B. Guernsey, is still living. Polly Guernsey died in 1854. Polly, the daughter of Polly Guernsey, became by marriage, Polly Thompson, in 1828, and died intestate in 1847, leaving seven children, four of whom instituted this suit, as plaintiffs, and the other three are defendants. The said William B. Guernsey, in 1849, conveyed all his interest in the premises to the other persons entitled under the will.

The plaintiffs claim that, under the will and the said conveyance, the children of Polly Thompson are, together, entitled to one equal third part of the premises, (each of said children being therefore entitled to one seventh of one third thereof,) and that William G. Guernsey and Lavinia Guernsey are each entitled to one equal third part thereof. While the defendants William G. Guernsey and Lavinia Guernsey claim each one half thereof, and deny that the children of Polly Thompson have any interest therein.

The claim of the plaintiffs was sustained at special term. The plaintiffs also asked for and obtained an accounting against William G. Guernsey, Lavinia Guernsey and James G. Thompson, which was had. From the judgment rendered, or portions thereof, the three defendants last named have severally appealed.

The first and most important question presented by the appeals is, whether under the will of William Spier, the children of Polly Thompson took any interest in the premises. The testator gives the land in question to Polly Guernsey for life, "then" in the language of the will, "to be equally divided amongst her now surviving children, or any of them that may be alive at her decease, *or the heirs of any that may be dead at the time of executing this my last will.*" It is under the last clause, "or the heirs of

any that may be dead at the time of executing this my last will," that the children of Polly Thompson claim, for she was not alive at the decease of Polly Guernsey, and herself took no absolute estate under the devise.

What then, did the testator mean by the words "at the time of *executing* this my last will." If he meant the time of signing and publishing it, the Thompson heirs cannot come in under the devise, for their mother was not then dead, and they were not then born. But we are at liberty to inquire whether he used the words in this technical sense or not, (*DeKay* v. *Irving,* 5 *Denio,* 646, 655,) and it is clear, I think, that this could not have been his meaning. The language may have another meaning, to wit, the carrying into effect the provisions of the will. "To carry into effect," is one of the definitions of the word "execute." Hence the word executor means, according to Worcester, citing Burrill, "one who is appointed by a testator, in his last will and testament, to see and take care that *it is executed,* or carried into effect after his decease." It was executing, in this sense, that the testator meant. He was providing for a future event; "then," that is, on the decease of Polly Guernsey, "to be equally divided among her *now* surviving children," (meaning all her then living children, being all the children she ever had, so far as appears,) "or any of them that may be alive at her decease," still looking to the future, and then comes this clause, "or the heirs of any that may be dead at the time of executing this my last will." The word "any," in this clause, according to the natural construction, refers to the previous subject, "her now surviving children," and under such construction cannot refer to children of his daughter Polly who had previously died, if indeed there were such. But none of her children had then died, so that, in point of fact, the testator could not have intended to refer to the heirs of any who were then, at the time of making and publishing the will, dead. Nor can we con-

clude that he supposed such fact might exist, and was providing for a possible state of facts, when we see that the eldest child was then but 22 years of age and unmarried, as were all the children. It is quite too improbable for belief, that he would be ignorant of the marriage of either of his grandchildren for the length of time implied in such hypothesis, and of the subsequent death also, notwithstanding the then comparatively infrequent means of intercommunication between the place of his residence and theirs. Besides, we find this phrase in connection with devises and bequests to other children of the testator, plainly having reference to a future time, as in the following instance: "I give to my three daughters *now living*, and to the heirs of Lydia Chichester (a deceased daughter) all my household furniture, two thirds at my decease, and the other third after their mother's decease, to be equally divided into four parts. * * * Should it so happen, in the course of divine providence, that any of my daughters should be dead, and leave no heirs living *at the time of executing this my last will*, then their shares to be equally divided," &c. And again: "The remaining property I have after my debts and funeral charges are paid, if any, I will should be divided into twelve equal parts, my son Joseph Spier or his heirs, two; my son William Spier or his heirs, two," (thus going through with all his children.) "I will further, that if it should happen, in the course of divine providence, that if either of my children should die and leave no heirs of their own body living *at the time of executing this my last will and testament*, then I will that their shares should be divided amongst my surviving heirs as above." The "executing" spoken of in these clauses, cannot mean the signing and publishing of the will, but evidently refers to a subsequent time, and must mean the going into execution of the provisions of the will with which the clause, as it occurs, is connected.

In the connection in which the words occur in the clause

under consideration, I have no doubt they were intended by the testator to indicate the time when the devise would take effect in favor of the devisees in remainder, by the death of Polly Guernsey. Then the will was fully *executed*, so far as this portion of the estate was concerned. According to this construction, the clause may be paraphrased as follows : " On the death of Polly Guernsey, to be equally divided amongst her children now living, or any of them that may be alive at her decease, or the heirs of any of them that may then be dead." It seems to me there is but little room for doubt, as to the meaning of the devise in this form. The testator thereby evidently intended to give the property, on the death of Polly Guernsey, to the children she had living at the time of the making of the will, or, in the event that any of them should die before Polly Guernsey, then to those of them who should survive her, and the heirs of those of them who should not. All concerned agree as to the first two branches of this proposition, to wit, that the intention was to give the property in remainder, to the children of Polly Guernsey living at the date of the will, or in the event of the death of any of them before her death, to those of them who should survive her—but the defendants William G. Guernsey and Lavinia Guernsey give no effect to the last clause, confining its application to the heirs of such of Polly Guernsey's children as are dead at the date of the will—and, as there were in fact none such, striking it out altogether. The meaning of this clause, at which we have arrived, however, makes it necessary to retain and construe it in its connection. When the testator, therefore, having given the property in remainder to the then living children of Polly Guernsey, goes on to provide that in the event of the death of any of them before her death, it shall go to those of them who " may be alive at her death, *or* the heirs of any of them that may then be dead," it is evidently a case where "or" has been used for "and," the

Scott v. Guernsey.

intent being to give it to the children of Polly Guernsey who should survive her, and the heirs of such of them as should not. This accords with the general intent of the testator manifested throughout the will; and moreover is the only construction which saves the devise from being void for uncertainty—for if the devise is to the survivors *or* to the heirs of those deceased—to the one class or the other—there being no means of ascertaining to which, of course it cannot take effect, and must fail altogether, (*Waite* v. *Templer*, 2 *Sim.* 524,) and in such case it is the duty of the court to adopt the construction which will leave it effectual in law, (*Mason* v. *Jones*, 2 *Barb.* 231,) and as the testator intended the clause to have some effect, and that intention can be carried out only by the change of " or" into " and," such change must be made. (*Roome* v. *Phillips*, 24 *N. Y.* 463.)

The construction given to the devise at the special term was manifestly the correct one, and should be upheld.

There can be no doubt that the accounting ordered between these tenants in common was proper in this case. This is not the statutory proceeding for partition, but a suit in equity; and therefore, as the court has jurisdiction of the subject matter and the parties in interest, it is in accordance with a well established rule, that it should do complete justice between the parties, by disposing of all questions between them in relation to the land and its use. In the language of Judge Story, "the jurisdiction having once rightfully attached, it shall be made effectual for the purposes of complete relief." (*Story's Eq. Jur.* § 64, *k.*) Besides, this action is brought for a partition and account, and in such case the latter will be decreed. (*Story's Eq. Jur.* § 655.)

In regard to the respective claims of William G. Guernsey and James G. Thompson, for improvements made by them on the premises, I think the judgment is right in denying those claims. The referee reports, as to the

buildings erected by Guernsey, and I think the evidence sustains him, that they were put up under an arrangement between him and the tenant for life, by which he was to have the accruing rents during her term, which he did receive, the aggregate amount of which largely exceeded the value of the buildings, with interest on such value. Having been built under such an arrangement, they are to be regarded as built by the tenant for life, and go, on her death, with the land, to those entitled in remainder. The circumstance that Guernsey is one of the tenants in remainder, does not give him any more equitable interest in the buildings than if he were a stranger. It is not like the case where a tenant in common in possession has made valuable improvements, with the assent of his co-tenant, or under a mistaken belief that he was sole owner. In such case it may be equitable that the tenant who has made the improvements should be allowed for them; and a court of equity will, in a proper case, refuse to assist his co-tenant to make partition, unless he does equity, by allowing the benefit of the improvements to the party who made them. (*Conklin* v. *Conklin,* 3 *Sandf. Ch. R.* 64. *Putnam* v. *Ritchie,* 6 *Paige,* 390. *Matter of Heller,* 3 *id.* 199.) True, in *Green* v. *Putnam,* (1 *Barb.* 500,) the improvements were made, as in this case, during the continuance of the life estate; but there was the assent of the co-tenant, to the erection of a house of proper size and value, and although a more expensive one was erected, the parties erecting it, or their grantees, were allowed only the expense of such a house as was consented to. In the case at bar, no assent of the co-tenants of Guernsey to the erection of the buildings is shown, and they were not built by him under a mistaken belief that he was the sole owner; and I do not think, inasmuch as he has been fully reimbursed, by the rents he has received, for all his expenditures, and interest, that equity demands that he should, in the accounting, be allowed for their value.

Neither do I see anything in the circumstances under which James G. Thompson made the improvements for which he claims, entitling him to be allowed therefor. He was in possession, but not claiming as sole owner, and there was no assent of his co-tenants. The decision at special term that he was not entitled to an allowance for his improvements, was, I think, correct.

The referee allowed interest upon the moneys received for rents, from the time of their receipt. In this I think he was right. The money belonged to all the co-tenants, in the proportion of their interest in the property, and when one received the whole he became the debtor of each, for his proportion, and an action for money had and received could have been brought for it, without a previous demand. (1 *R. S.* 750, § 9.) There being default in the payment of a liquidated amount of money due, interest was properly charged. (*Williams* v. *Sherman*, 7 *Wend.* 109. *Van Rensselaer* v. *Jewett*, 2 *Comst.* 135.)

The insurance paid by Guernsey on the buildings erected by him was correctly disallowed. The policy was to him and his mother, the tenant for life, for their benefit, and not for that of the other tenants in common of the remainder, and they could have derived no benefit from it. (*Wyman* v. *Prosser*, 36 *Barb.* 368.)

The judgment correctly, I think, makes the amounts found due from the parties who have received the rents of the premises liens on their respective shares of the real estate for the excess received beyond their shares of such rents. (*Hannan* v. *Osborn*, 4 *Paige*, 336.)

The defendant William G. Guernsey objects to the judgment in that it directs a sale, and not a partition of the premises, although the sale is directed to be made in parcels. The seeming incongruity of these directions vanishes when we see that the parcels specified are by no means such as would constitute a division according to the respective interests of the parties; but are such as (in the

opinion of the referee, which opinion, so far as I can see, is well founded) will be likely to bring the most money in the aggregate. I see no reason to make any change in regard to this part of the judgment.

There is no error in the order bringing in D. Wilmot Scott, the administrator of his wife Mary C. Scott, one of the plaintiffs, who died after the commencement of the suit. As such administrator he was entitled to that por-- tion of the rents which accrued to Mary C. Scott prior to her death; and as the action seeks an accounting, as well as a partition, complete relief could not be granted without making him a party.

Upon the whole, I do not see any error in the judgment, and am of the opinion that it should be affirmed, with costs

[BROOME GENERAL TERM, May 15, 1866. *Parker*, P. J., and *Balcom, Mason* and *Boardman*, Justices.]